IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                      No. CR 24-0092 JB

VALENTIN GARCIA,

      Defendant.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on the Defendant's Objections to Presentence

Report, filed August 6, 2024 (Doc. 30)("Objections").  The Court held sentencing hearings on

November 14, 2024, and November 25, 2024.  See Clerk's Minutes at 1, filed November 14, 2025

(Doc. 42)("November 14, 2024, Minutes"); Clerk's Minutes at 1, filed November 25, 2024

(Doc. 43)("November 25, 2024, Minutes").  The primary issue is whether the Court should sustain

Defendant Valentin Garcia's Objections and decrease Garcia's United States Sentencing

Guidelines ("U.S.S.G." or "Guidelines") offense level by 4 levels, because Plaintiff United States

of America cannot prove, by a preponderance of the evidence, that Garcia committed a "federal,

state, or local offense punishable by a term of imprisonment of one year or more" after escaping

from "the non-secure custody of a community corrections center, community treatment center,

'halfway house,' or similar facility."  U.S.S.G. § 2P1.1(b)(3).  After carefully considering the

parties' arguments, the relevant materials in the record, and the applicable law, the Court overrules

---

[1]On August 14, 2024, the Court entered an Order overruling the Defendant's Objections to Presentence Report, filed August 6, 2024 (Doc. 30).  See Order at 1-3, filed August 14, 2024 (Doc. 34)("Order").  In the Order, the Court states that it would "issue at a later date, however, a Memorandum Opinion more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

Garcia's Objections, because the United States has proven -- by a preponderance of the evidence, see United States v. Magallanez, 408 F.3d 672, 685 (10th Cir. 2005)(McConnell, J.) -- that, after escaping from Diersen Charities Residential Reentry Center on August 7, 2023, Presentence Investigation Report ¶ 8, at 4, filed July 11, 2024 (Doc. 28)("PSR"), Garcia violated State law by: (i) conspiring and attempting to commit an armed robbery and committing an aggravated battery with a deadly weapon on October 7, 2023; (ii) unlawfully possessing a firearm as a felon on December 28, 2023; and (iii) escaping from custody on December 29, 2023. See PSR ¶ 55-57, at 18-19. The applicable offense level is 11, the applicable criminal history category is VI, and the Guidelines imprisonment range is 27 to 33 months.

## FACTUAL BACKGROUND

Garcia does not object to the PSR's facts except those in ¶¶ 55-57, at 18-19 See Objections at 2-3. The Court thus concludes that those undisputed facts are the Court's findings of fact. See Fed. R. Crim. P. 32(i)(3)(A) ("[The court] may accept any undisputed portion of the presentence report as a finding of fact."). Regarding the three paragraphs to which Garcia objects, the Court concludes that the United States has shown -- by a preponderance of the evidence -- that the allegations in those paragraphs are true. See infra, at 4-12, nn.4-8. Accordingly, the Court also includes those allegations in the Court's findings of fact.

When resolving factual objections, the Court must determine whether the United States has met its burden of proving disputed facts by a preponderance of the evidence. See United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008). In evaluating whether the United States has met its burden, "sentencing courts may consider hearsay evidence provided that the evidence has sufficient indicia of reliability." United States v. Dazey, 403 F.3d 1147, 1177 n.7 (10th Cir. 2005).

See U.S.S.G. § 6A1.3.[2]  "This is not a high standard, for it requires only 'minimal indicia of reliability.'" United States v. Ayon, 226 F. App'x 834, 840 (10th Cir. 2007)(unpublished)(quoting United States v. Fennell, 65 F.3d 812, 813 (10th Cir. 1995)).[3]

---

[2]Although a district court "resolving any dispute concerning a factor important to the sentencing determination . . . may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy," U.S.S.G. § 6A1.3, the federal rules of evidence can be relevant to fact-finding at sentencing.  In United States v. Calvert-Cata, the Court holds, in a revocation context, that it may consider and rely upon out-of-court statements if those statements are admissible under the federal rules and Crawford v. Washington, 541 U.S. 36 (2004)("Crawford"), without evaluating separately those statements' reliability.  See No. CR 16-4566 JB, 2022 WL 14813473, at *12 (D.N.M. October 26, 2022)(Browning, J.), aff'd, No. 23-2000, 2024 WL 33901 (10th Cir. January 3, 2024).  The Court reasons that, "because evidentiary standards for revocation hearings are supposed to be more inclusive and flexible than trials" it "makes no sense to require the United States to" clear hurdles that are not there at trial.  United States v. Calvert-Cata, No. CR 16-4566 JB, 2022 WL 14813473, at *12.

Here, the Court concludes that the same principles apply and that, in a sentencing context, it may consider and rely upon out-of-court statements that are admissible under the Federal Rules of Evidence without evaluating separately those statements' reliability.  Like revocation hearings, sentencing hearings are supposed to have more inclusive and flexible evidentiary standards than trials.  For example, at sentencing, district courts use a preponderance of the evidence standard to resolve factual disputes and apply sentencing enhancements.  See United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008); United States v. Magallanez, 408 F.3d 672, 685 (10th Cir. 2005).  Similarly, a district court may "revoke supervised release after concluding that the defendant violated a condition of probation by a preponderance of the evidence."  United States v. Hykes, 653 F. Supp. 3d 913, 926 (D.N.M. 2022)(Browning, J.)(citing 18 U.S.C. § 3583(e)).  Also, a district court may consider, for both sentencing and revocation, out-of-court statements that are not admissible at trial.  See U.S.S.G. § 6A1.3; Fed. R. Crim. P. 32.1(b)(2)(C).  Moreover, the standard for considering an out-of-court statement at sentencing is higher than the standard for considering an out-of-court statement at revocation.  At sentencing, a district court need only determine that the statement has "sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3.  See United States v. Dazey, 403 F.3d 1147, 1177 n.7 (10th Cir. 2005).  At revocation, a district court must weigh the statement's reliability and the defendant's interest in cross-examination against the United States' explanation for not presenting a witness.  See United States v. Jones, 818 F.3d 1091, 1099-1100 (10th Cir. 2016); United States v. Murphy, 769 F. App'x 631, 633-34 (10th Cir. 2019).  Given that it is easier to consider an inadmissible out-of-court statement at sentencing, it makes sense to apply the Court's reasoning in United States v. Calvert-Cata to sentencing; if the Court can consider admissible out-of-court statements at revocation without evaluating separately whether those statements are reliable, then the Court can do the same at sentencing, where the evidentiary hurdle is lower.

[3]United States v. Ayon, 226 F. App'x 834 (10th Cir. 2007), is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in

On December 17, 2015, the Court sentences Garcia to 120 months in custody followed by a three-year supervised release term.  See PSR ¶ 63, at 4.  On May 4, 2023, Garcia establishes residence at Diersen Charities Residential Reentry Center ("Diersen Center") to serve the last 120 days of his custodial sentence.  See PSR ¶ 7, at 4.  Upon intake at the Diersen Center, Garcia signs a form stating that he understands that he is in the custody of the Attorney General of the United States and that leaving the Diersen Center without permission constitutes an escape from the Attorney General's custody.  See PSR ¶ 7, at 4.  On August 7, 2023, Garcia leaves the Diersen Center without authorization and does not return.  See PSR ¶ 8, at 4.  On October 7, 2023, Garcia attacks Federico Canero with a hammer, causing Canero significant injuries, and tries to steal Canero's truck.  See PSR ¶ 55, at 18.[4]

---

the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Ayon, United States v. Murphy, 769 F. App'x 631 (10th Cir. 2019), United States v. Hendrickson, 592 F. App'x 699 (10th Cir. 2014), United States v. Davis, 802 F. App'x 318 (10th Cir. 2020), and United States v. Padilla, 793 F. App'x 749 (10th Cir. 2019), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[4]Although Garcia denies the allegations in ¶ 55, at 18, the Court concludes that the United States has shown -- by a preponderance of the evidence -- that those allegations are true.  Garcia asserts that he was not involved in the incident which ¶ 55, at 18, describes.  See Objections at 2; Draft Transcript of November 14, 2024, Hearing at 7:11-10:23 (Fooks)(taken November 14, 2024)("November 14, 2024, Tr.")(The Court's citations to the draft transcript of the hearing refers to the court reporter's original, unedited version; any final transcript may contain slightly different page and/or line numbers).  Beyond his denial, Garcia does not introduce evidence challenging ¶ 55's allegations.  The United States argues that it has introduced enough evidence to show -- by a preponderance of the evidence -- that Garcia is involved in the October 7, 2023, incident as ¶ 55, at 18, alleges.  See November 14, 2024, Tr. at 11:1-12:2 (Armijo); United States' Response to Defendant's Objections to Presentence Report Doc 30 at 4-5, filed August 13, 2024

(Doc. 32)("Objections Response").  To support ¶ 55's allegations, the United States introduces a sworn arrest-warrant affidavit, which describes the Albuquerque Police Department's investigation into the October 7, 2023, incident.  See Criminal Complaint -- Arrest Warrant Affidavit at 1-5 (dated January 16, 2024), filed August 13, 2024 (Doc. 32-1)("Arrest Warrant #1").

On October 7, 2023, two Albuquerque Police Department ("APD") officers respond to an "aggravated battery call for service where a male subject was threatened by a male and female with a gun in an attempt to steal a pickup truck."  Arrest Warrant #1 at 1.  When they arrive at the scene, the APD officers speak with Canero, who is holding ice against his head.  See Arrest Warrant #1 at 1.  The officers observe a substantial amount of blood on Canero's face and shirt, multiple bleeding contusions on his face, a large bleeding and swollen gash on his left cheek, and raised bumps on his forehead and top of his head.  See Arrest Warrant #1 at 1.  The officers request "emergency medical assistance for Federico due to the nature of his injuries."  Arrest Warrant #1 at 1.  Canero tells the officers that an unknown male and female demand the keys to his truck at gunpoint.  See Arrest Warrant #1 at 1.  Canero says that, after Canero refuses to provide the keys, Canero and the man get into a physical altercation, and the unknown man strikes Canero six to seven times with a hammer which was inside the truck bed.  See Arrest Warrant #1 at 1-2.

The Court may rely on Arrest Warrant #1's descriptions of what officers observe on October 7, 2023, even though those descriptions are out-of-court statements, because the officers' statements have sufficient indicia of reliability, given that they are made under penalty of perjury.  See United States v. Cook, 550 F.3d 1292, 1296-97 (10th Cir. 2008)(holding that an investigating officer's affidavit "clear[s] th[e] low hurdle" of "'minimal indicia of reliability'" for consideration at sentencing)(quoting United States v. Browning, 61 F.3d 752, 755 (10th Cir. 1995)).  Arrest Warrant #1's description of Canero's out-of-court statements, which are double hearsay, requires more analysis.  The Court may consider the first hearsay layer -- Arrest Warrant #1's statements indicating that the officers spoke with Canero shortly after the attack -- because those statements have sufficient indicia of reliability, given that they are made under penalty of perjury and describe what responding officers did when they arrived at a crime scene.  See United States v. Cook, 550 F.3d at 1296-97.

The Court may consider the second hearsay layer -- Canero's statements describing the attack and his attackers -- because those statements are admissible at trial as excited utterances under rule 803(2), and there is no Crawford problem.  See United States v. Calvert-Cata, WL 14813473, at *12 (holding, in a revocation context, that the Court may rely on out-of-court statements that are admissible under the Federal Rules of Evidence and Crawford v. Washington, 541 U.S. 36 (2004)("Crawford"), without evaluating separately whether those statements are reliable).  Under the excited-utterance hearsay exception, a court may admit "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  Fed. R. Evid. 803(2).  In the Tenth Circuit, the "excited-utterance exception has three requirements: (1) a startling event; (2) the statement was made while the declarant was under the stress of the event's excitement; and (3) a nexus between the content of the statement and the event."  United States v. Pursley, 577 F.3d 1204, 1220 (10th Cir. 2009)(concluding that an assault victim's statements to officers describing the assault twenty to thirty minutes after the assault are admissible excited utterances).  "Courts regularly admit statements made to law enforcement in the aftermath of violent assaults as excited utterances."  United States v. Calvert-Cata, 2022 WL 14813473, at *14.  See United States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990)(concluding that an assault victim's statements to officers describing the assault five to six hours after the assault are admissible as excited utterances); United States v. Harry, No. CR 10-1915 JB, 2014 WL 1950409, at *11-12 (D.N.M. May 7, 2014)(Browning, J.)(concluding that a rape victim's statements, made while the

victim is crying, to her friend describing the rape within an hour of the rape are admissible as excited utterances). Canero's statements, which are "made to law enforcement in the aftermath of [a] violent assault," United States v. Calvert-Cata, 2022 WL 14813473, at *14, satisfy all three prongs of the Tenth Circuit's excited utterance test: he tells the officers about a violent attack, which is a startling event, while he is still bleeding and under stress from the attack, see United States v. Pursley, 577 F.3d at 1220; Arrest Warrant #1 at 1. Thus, the Court would admit Canero's statements as excited utterances under rule 803(2). See Fed. R. Evid. 803(2).

There is also no Crawford problem with Canero's statements, because those statements are not testimonial. See Ohio v. Clark, 576 U.S. 237, 245 (2015)("[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial.").

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis v. Washington, 547 U.S. 813, 822 (2006). Canero's statements are not testimonial, because there is an ongoing emergency -- Canero's significant injuries -- and the primary purpose of the officers' questioning is to gain information about his injuries and provide medical assistance. See Arrest Warrant #1 at 1 (noting that, after speaking with Canero, the officers request "emergency medical assistance for [Canero] due to the nature of his injuries"). With no Crawford problem, the Court would admit Canero's statements at trial under rule 803(2). Accordingly, the Court may consider those statements here. See United States v. Calvert-Cata, 2022 WL 14813473, at *12.

Viewing surveillance footage of the incident, APD investigators notice that the hammer-wielding man is holding a soda bottle during the incident. See Arrest Warrant #1 at 2. An APD forensic scientist matches a latent fingerprint on the bottle to Brooke Gomez' fingerprints. See Arrest Warrant #1 at 2. An APD investigator, Anthony Guerrera, observes that Gomez' driver's license photograph resembles closely the surveillance footage. See Arrest Warrant #1 at 2. Guerrera conducts background research and finds that Gomez has an active arrest warrant for a State probation violation. See Arrest Warrant #1 at 2. Guerrera reaches out to the New Mexico Corrections Department Probation and Parole Division ("Probation and Parole") and asks if Gomez has any known male associates. See Arrest Warrant #1 at 2. Probation and Parole tells Guerrera that Robert Sanchez is a known associate. See Arrest Warrant #1 at 2. Comparing the driver's license photograph of Sanchez with the surveillance footage, Guerrera notices "similarities in the face, complexion, color of hair, and style of facial hair." Arrest Warrant #1 at 2. On December 28, 2023, Guerrera presents Canero with a photographic lineup, including Sanchez' photograph, but Canero advises Guerrera that Canero cannot remember what his attacker looks like. See Arrest Warrant #1 at 2. Again, the Court may rely on Guerrera's statements about his investigation, because those out-of-court statements have sufficient indicia of reliability, given that they are made under penalty of perjury and they reflect Guerrera's first-hand recollection of his investigative steps See United States v. Cook, 550 F.3d at 1296-97.

On January 8, 2024, Probation and Parole contacts Guerrera and informs him that Gomez is arrested for receiving/transferring a stolen motor vehicle. See Arrest Warrant #1 at 2. On January 10, 2024, Gomez tells Guerrera that she was with Garcia when he attacked Canero and tried to steal Canero's truck on October 7, 2023. See Arrest Warrant #1 at 3. Guerrera compares

On December 28, 2023, Bernalillo County deputies investigate several individuals making threats from inside a gray car outside a home.  See PSR ¶ 56, at 19.  When the deputies arrive, they observe Garcia backing the gray car out of the driveway.  See PSR ¶ 56, at 19.  After backing out, Garcia drives the gray car into the deputies' police vehicle, causing one of the deputies to shift in

---

a photograph of Garcia with the surveillance footage, and notices similarities in the face, facial hair, hair color, and distinctive tattoos on Garcia's face and left arm.  See Arrest Warrant #1 at 3.

Again, the Court may rely on Guerrera's statements about his investigation -- including that he spoke with Gomez and noticed the similarities between Garcia and the man on the surveillance video -- because those statements have sufficient indicia of reliability, given that they are made under penalty of perjury and they reflect Guerrera's first-hand recollection of his investigative steps.  See United States v. Cook, 550 F.3d at 1296-97.  Guerrera's description of Gomez' statement identifying Garcia, which is double hearsay, requires further analysis.  The Court may rely on the first hearsay layer -- Guerrera's statement that he spoke with Gomez -- because that statement bears sufficient indicia of reliability, given that it is made under penalty of perjury and reflects Guerrera's first-hand recollection of his investigative steps.  See United States v. Cook, 550 F.3d at 1296-97.  Regarding the second hearsay layer -- Gomez' statement identifying Garcia -- the Court concludes that Gomez' statement would not be admissible at trial, because that statement does not fall into any hearsay exception.  The Court may rely on Gomez' statement, however, because it bears sufficient indicia of reliability; Garcia has a long criminal history of violent, theft-related offenses, and Gomez' identification of Garcia aligns with Guerrera's observations of the surveillance footage.  See PSR ¶¶ 26-33, at 6-12; United States v. Martinez, 824 F.3d 1256, 1262 (10th Cir. 2016)(affirming district court's reliance, at sentencing, on out-of-court, inculpatory statements made by a defendant's co-conspirator and noting that "the district court was entitled to rely on [the defendant's] long history of theft offenses" in "assessing whether [the co-conspirator's] statements had sufficient indicia of reliability"); United States v. Ruby, 706 F.3d 1221, 1230 (10th Cir. 2013)("While prior incidents are not necessarily probative of later conduct, Fed. R. Evid. 404(a), this type of evidence may help establish another piece of the minimal indicia of reliability necessary to consider hearsay at sentencing.").  Accordingly, the Court concludes that it may rely on Gomez' out-of-court statement identifying Garcia.

To challenge ¶ 55's factual allegations, which identify Garcia as the October 7, 2023, perpetrator, Garcia argues that the United States has not satisfied its burden, because the United States initially believed Sanchez was the perpetrator, and Canero cannot identify his assailant.  See November 14, 2024, Tr. at 7:11-10:23 (Fooks).  On balance, the Court concludes, however, that the United States has proven -- by a preponderance of the evidence -- that Garcia attacked Canero and tried to steal his truck.  The same observations which tie Sanchez to the October 7, 2023, incident -- physical similarities between a photograph and surveillance footage -- also tie Garcia to the incident.  Moreover, Gomez, whose fingerprint is found at the crime scene, identifies Garcia and not Sanchez as the October 7, 2023, perpetrator.  Garcia introduces no evidence tending to prove that Sanchez or anybody else is the October 7, 2023, perpetrator, or that Garcia was elsewhere during the incident.  Accordingly, the Court concludes that the United States has shown -- by a preponderance of the evidence -- that ¶ 55's factual allegations are true.

his seat.  See PSR ¶ 56, at 19.  After the collision, Garcia exits the gray car and runs into the house

while carrying a firearm.  See PSR ¶ 56, at 19.  Early the next morning, after a lengthy police

standoff involving a SWAT team, Garcia flees the house and authorities use a K9 to detain him.

See PSR ¶ 56, at 19.  The K9 bites Garcia on the hand, and authorities arrest Garcia on outstanding

felony warrants.[5]  See PSR ¶ 56, at 19.

_____

[5]Although Garcia denies the allegations in ¶ 56, at 19, the Court concludes that the United States has shown -- by a preponderance of the evidence -- that those allegations are true.  See Objections at 2.  Garcia insists that he is not the person who exits the car with a firearm in hand.  See Objections at 2; November 14, 2024, Tr. at 5:5 (Fooks).  Garcia asserts that he was sitting in the back seat of the gray car and that Daniel Drake was the driver who exited the car with a firearm.  See November 14, 2024, Tr. at 18:6-22 (Fooks).  To support Garcia's assertion, Garcia's lawyer describes his conversations with Victoria Lambert, who was sitting in the front passenger seat.  See November 14, 2024, Tr. at 5:5 (Fooks); State of New Mexico Uniform Incident Report at 8 (dated December 28, 2023), filed August 9, 2024 (Doc. 31-2)("Police Report").  Although Garcia files a subpoena for Lambert's testimony on November 14, 2024, Lambert does not show up to Court at the November 14, 2024, hearing.  See November 14, 2024, Tr. at 5:7-9 (Fooks).  Garcia's lawyer says that, at a later date, Lambert will testify that Garcia, Drake, Drake's uncle, and she were in the gray car on December 28, 2023; Drake and Lambert were in the front seats, and Garcia and Drake's uncle were in the back seats.  See November 14, 2024, Tr. at 18:6-22 (Fooks).  Garcia's counsel further states that Lambert will testify that the two backseat passengers -- Garcia and Drake's uncle -- exited the gray car and went into the house before the interaction with the police began.  See November 14, 2024, Tr. at 18:6-22 (Fooks).  Garcia's counsel admits that other aspects of ¶ 56, at 19, are true: Garcia was in the house, he ran away from the house, and the K9 bit him.  See November 14, 2024, Tr. at 18:6-22 (Fooks).  Garcia maintains, however, that Drake and not Garcia drove the gray car into the police vehicle, and that Drake and not Garcia is the one who runs into the house after the crash while holding a firearm.  See November 14, 2024, Tr. at 18:6-22 (Fooks).  Despite his arguments at the November 11, 2024, hearing, Garcia says, at the next hearing, that he will not call Lambert as a witness.  See Draft Transcript of November 25, 2024, Hearing at 3:24-4:5 (Fooks)(taken November 25, 2024)("November 25, 2024, Tr.").

The United States argues that Garcia is the driver who exits the car with a firearm.  See Objections Response at 8.  To support its argument, the United States introduces a sworn arrest warrant affidavit which describes the December 28, 2023, incident.  See Arrest Warrant Affidavit/Criminal Complaint at 1-4 (dated February 15, 2024), filed August 13, 2024 (Doc. 32-2)("Arrest Warrant #2").  The United States Probation Office ("USPO") also introduces a police report and dash camera footage of the incident to support the factual allegations in ¶ 56, at 19, including that Garcia is the driver.  See Addendum to the Presentence Report at 2-3, filed August 9, 2024 (Doc. 31)("PSR Addendum #1"); State of New Mexico Uniform Incident Report at 1-11, filed August 9, 2024 (Doc. 31-2)("Police Report #1"); Bates Number 27 ("Dash Cam Video").

The Police Report lends some support to Garcia's narrative.  See Police Report at 10-11.  In the Police Report, both responding deputies -- Deputies Justin Placencio and Taylor Feist -- describe how, when the deputies interview Lambert at the scene, Lambert says that Drake is the driver.  See Police Report at 8-11.  Placencio and Feist also note that, when Lambert identifies Drake as the

driver, the deputies pull a photograph of Drake from law enforcement databases, and, at that time, Placencio and Feist believe that this photograph matches the driver.  See Police Report at 8-11. Feist also notes that, when they detain Garcia, Garcia says that he was in the gray car's back seat. See Police Report at 11.  The Court may consider the officers' hearsay statements in the Police Report describing what happens at the crime scene because these detailed statements bear "sufficient indicia of reliability," given that Placencio and Feist record these first-hand observations shortly after the incident, and because Placencio and Feist's observations are internally consistent. United States v. Dazey, 403 F.3d at 1177 n.7.  See United States v. Anderson, 62 F.4th 1260, 1269 (10th Cir. 2023)("[A] sentencing court[, applying an enhancement to a defendant's offense level,] can rely on information in an unadmitted police report if the record contains corroborative evidence and the relevant information is summarized somewhere in the record (e.g., the PSR).")(emphasis in United States v. Anderson); United States v. Padilla, 793 F. App'x 749, 757 (10th Cir. 2019)(holding that a district court may rely on a police report at sentencing when it finds "that certain features of the police report itself -- such as its level of detail, internal consistency, and quality -- independently support the probably accuracy of the relevant information contained therein"); United States v. Ayon, 226 F. App'x at 841 (concluding that an out-of-court "statement made closer to the event in question . . . is more likely to be credible").

The Court, however, does not consider Lambert's hearsay statements at the crime scene, because those statements are not admissible under the Federal Rules of Evidence, and they do not bear sufficient indicia of reliability.  Lambert's statements are not sufficiently reliable for two reasons: (i) her statements contradict other record evidence indicating that Garcia is the driver; and (ii) she does not come to Court to testify that Garcia is the driver, even though Garcia subpoenas her and the Court gives her two opportunities to testify.  See United States v. Fennell, 65 F.3d 812, 813-14 (10th Cir. 1995)(concluding that out-of-court statements are not sufficiently reliable, where those statements are "unsupported by other evidence," and the declarant does not provide a sworn affidavit to support her allegations); November 14, 2024, Tr. at 4:17-5:1 (Fooks); November 25, 2024, Tr. at 3:24-4:5 (Fooks).

For similar reasons, the Court does not consider Garcia's hearsay statements at the crime scene.  Garcia's statements are not admissible under the Federal Rules of Evidence, and they do not bear sufficient indicia of reliability.  Garcia's statements are not sufficiently reliable for three reasons: (i) his statements contradict other record evidence; (ii) he provides other false statements during the same interaction; and (iii) he has reason to lie to officers about who is driving the car. See United States v. Fennell, 65 F.3d at 813-14.  Cf. United States v. Ruby, 706 F.3d 1221, 1230 (10th Cir. 2013)(concluding that out-of-court statements from "three relatively neutral witnesses" are sufficiently reliable, and contrasting those statements with unreliable out-of-court statements from witnesses in other Tenth Circuit cases who "had reasons to lie").

On balance, the Police Report and the Arrest Warrant #2 undermine Garcia's narrative. Placencio and Feist note that the driver has facial tattoos; Garcia also has facial tattoos.  See Police Report at 8-11; Arrest Warrant #2 at 1; PSR at 3.  Feist also asserts that, based on his review of dash camera footage, the only occupants of the car were the driver and the front passenger.  See Arrest Warrant #2 at 1; Police Report at 11.  Placencio and Feist note that, when the SWAT team detains Garcia, Placencio and Feist identify Garcia as the driver.  See Police Report #1 at 8-11.  Feist also notes that Garcia provides a false name, date of birth, and social security number to deputies when they detain him.  See Police Report #1 at 11; Arrest Warrant #2 at 1.  These false statements cast doubt on Garcia's other statements made during his detention -- namely, that he was in the back seat.  Other aspects of the Police Report and Arrest Warrant #2 indicate that Garcia is the driver. Feist asserts that, based on his review of dash camera footage, the driver exiting the gray car is

wearing the same shoes that Garcia is wearing when he is detained. <u>See</u> Police Report #1 at 11; Arrest Warrant #2 at 2. Shortly after Garcia enters the home, Placencio and Feist call in a SWAT team to assist. <u>See</u> Police Report #1 at 10; Arrest Warrant #2 at 1. When SWAT eventually enters the home after detaining Garcia, SWAT recovers the same firearm that the driver was holding and confirms that no one else is inside the home. <u>See</u> Police Report #1 at 11; Arrest Warrant #2 at 2. The Court may consider these aspects of Police Report #1 and Arrest Warrant #2, which are hearsay, because these out-of-court statements bear sufficient indicia of reliability, given that Arrest Warrant #2 is a sworn affidavit, and these statements align with Feist's and Placencio's detailed statements in the Police Report, which were made shortly after the incident. <u>See</u> <u>United States v. Cook</u>, 550 F.3d at 1296-97; <u>United States v. Padilla</u>, 793 F. App'x at 757; <u>United States v. Ayon</u>, 226 F. App'x at 840-41.

The Dash Cam Video is inconclusive. The Court has reviewed the Dash Cam Video many times. The clip of the driver exiting the car is short and blurry. <u>See</u> Dash Cam Video at 0:00-0:05. Because of the video's low quality, the Court cannot identify positively whether the driver in the video is Garcia. <u>See</u> Dash Cam Video at 0:00-0:05. The video also only shows the gray car's front and left sides. <u>See</u> Dash Cam Video at 0:00-0:05. Although there does not appear to be anyone in the left-side rear seat, it is possible that someone is sitting in the right-side rear seat or that someone sitting in one of the rear seats exits the car before the police interaction begins. <u>See</u> Dash Cam Video at 0:00-0:05. Accordingly, the Court does not agree fully with Feist's interpretation of the footage, <u>i.e.</u>, that the footage shows that the only occupants were the driver and the front passenger. Feist's other interpretation -- that the footage shows that the person exiting the car is wearing the same shoes that Garcia is wearing when he is detained -- is legitimate, because the footage gives a clear view of the suspect's shoes. <u>See</u> Dash Cam Video at 0:00-0:05.

The Court cannot say that the Dash Cam Video, alone, shows that Garcia is the driver. On balance, the Court concludes, however, the United States carries its burden to show that Garcia is the driver. Placencio and Feist do not observe anyone else in the vehicle, and the SWAT team does not discover anyone else in the home. <u>See</u> Police Report #1 at 8-11; Arrest Warrant #2 at 1-2. After the SWAT team detains Garcia, Placencio and Feist identify Garcia as the driver. <u>See</u> Police Report at 8-11. Feist asserts, in a sworn affidavit, that Garcia is wearing the same shoes as the suspect in the Dash Cam Video. <u>See</u> Arrest Warrant #2 at 2. Garcia has facial tattoos, and Placencio and Feist observe that the driver has facial tattoos. <u>See</u> Police Report at 8-11; Arrest Warrant #2 at 1; PSR at 3. Although Lambert tells Placencio and Feist that Drake is the driver, Lambert has not testified to this fact. <u>See</u> Police Report #1 at 8-11; November 25, 2024 Tr. at 3:24-4:5 (Fooks). Although Garcia tells authorities that he was in the back seat, Garcia also provides a false name, date of birth, and social security number during the same interaction. <u>See</u> Police Report #1 at 11. Even if the Court considers Lambert's and Garcia's out-of-court statements, those statements are not credible, particularly given that Lambert will not provide a sworn statement supporting her initial identification of Drake as the driver, and Garcia has reason to lie. <u>See</u> <u>United States v. Fennell</u>, 65 F.3d at 813-14. <u>Cf.</u> <u>United States v. Ruby</u>, 706 F.3d at 1230. Feist's sworn affidavit, which indicates that Garcia is the driver, is credible, because it is sworn, detailed, based on first-hand observations, and corroborative of other record evidence. <u>See</u> <u>United States v. Cook</u>, 550 F.3d at 1296-97; <u>United States v. Anderson</u>, 62 F.4th at 1269; <u>United States v. Padilla</u>, 793 F. App'x at 757; <u>United States v. Ayon</u>, 226 F. App'x at 840-41. Considering all of the evidence on this issue, the Court concludes that the United States has shown -- by a preponderance of the evidence -- that Garcia is the driver who exits the gray car with a firearm.

Authorities bring Garcia to Kaseman Hospital to treat the K9 bite.  See PSR ¶ 57, at 19.

Because Garcia's hand is placed in a cast, authorities use flex cuffs,[6] instead of metal cuffs, to

restrain him at Kaseman Hospital.  See PSR ¶ 57, at 19.  Authorities transfer Garcia from Kaseman

Hospital to the Prisoner Transport Center located at 401 Roma Ave. NW, Albuquerque, New

Mexico.  See PSR ¶ 57, at 19.  Once at the Prisoner Transport Center, Garcia breaks free of the

flex cuffs and runs away.  See PSR ¶ 57, at 19.[7]  After Garcia runs for approximately three blocks,[8]

authorities detain him and return him to the Prisoner Transport Center.  See Criminal Complaint

at 1 (dated August 12, 2024), filed August 13, 2024 (Doc. 32-3)("State Criminal Complaint").

---

[6]Flex cuffs, also called plastic handcuffs, "are a form of physical restraint for the hands made of plastic straps."    Plastic handcuffs,    Wikipedia,    available    at https://en.wikipedia.org/wiki/Plastic_handcuffs (last visited May 21, 2025).

[7]Although Garcia denies the allegations in ¶ 57, at 19, the Court concludes that the United States has shown -- by a preponderance of the evidence -- that those allegations are true.  Garcia "denies that he attempted to flee from law enforcement as alleged in ¶ 57 of the PSR."  See Objections at 3.  Beyond this denial, Garcia does not offer evidence challenging the factual allegations in ¶ 57, at 19.  See Objections at 3-4 (making a legal argument that Garcia's actions, as the PSR alleges, constitute an attempted escape, rather than an escape); November 11, 2024 Tr. at 5:16-6:2 (Fooks)(similar).  To support the factual allegations in ¶ 57, at 19, the United States introduces a sworn criminal complaint, written by APD Officer Alyssa Mercedes Salazar, which describes how Garcia broke free of his flex cuffs and ran away from Salazar on December 29, 2023.  See Criminal Complaint at 1-2 (dated August 12, 2024), filed August 13, 2024 (Doc. 32-3)("Criminal Complaint").  The Court may rely on the Criminal Complaint's description of Garcia's flight, because that description bears sufficient indicia of reliability, given that the Criminal Complaint is sworn and based on Salazar's first-hand observations of Garcia's actions. See United States v. Cook, 550 F.3d at 1296-97.  Because Garcia has not introduced evidence challenging the State Criminal Complaint, the Court concludes that the United States has shown -- by a preponderance of the evidence -- that the factual allegations in ¶ 57, at 19, are true.

[8]The Criminal Complaint describes how Garcia, starting at 401 Roma Ave NW, runs northbound up 4th St., turns west on Lomas Blvd, and then turns north on 5th St. before being detained by another police officer on 5th St.  See Criminal Complaint at 1.  Garcia does not introduce evidence challenging the State Criminal Complaint's description of the route he took when he ran away on December 29, 2023.  Taking judicial notice of downtown Albuquerque's layout, the Court concludes that Garcia's path covers approximately three city blocks.  See United States v. Piggie, 622 F.2d 486, 488 (10th Cir. 1980)("Geography has long been peculiarly susceptible to judicial notice for the obvious reason that geographic locations are facts which are not generally controversial.")

## PROCEDURAL BACKGROUND

The Court describes this case's procedural background in five sections. First, the Court describes Garcia's indictment, plea, and PSR. Second, the Court discusses Garcia's Objections. Third, the Court describes the USPO's Addendum to the Presentence Report, filed August 9, 2024 (Doc. 31)("PSR Addendum"). Fourth, the Court discusses the United States' Response to Defendant's Objections to Presentence Report Doc [sic] 30, filed August 13, 2024 (Doc. 32)("Objections Response"). Fifth, the Court summarizes two hearings held on November 14, 2024, and November 25, 2024.

### 1.    Garcia's Indictment, Plea, and PSR.

On January 5, 2024, a federal grand jury indicts Garcia. See Indictment at 1, filed January 23, 2024 (Doc. 14)("Indictment"). The Indictment alleges that Garcia knowingly escaped from custody at the Diersen Center on August 7, 2023, in violation of 18 U.S.C. § 751(a)("Escape Charge"). See Indictment at 1. On May 16, 2024, Garcia pleads guilty to the Escape Charge. See Plea Minute Sheet at 1, filed May 16, 2024 (Doc. 24). On July 11, 2024, the United States Probation Office ("USPO") files Garcia's PSR and determines that his total offense level is 11. See PSR ¶ 24, at 6. The PSR describes three pending charges against Garcia based on the three incidents described earlier in this Memorandum Opinion and Order: (i) Garcia's hammer attack on Canero on October 7, 2023; (ii) Garcia's armed standoff with police on December 28, 2023; and (iii) Garcia's flight in downtown Albuquerque on December 29, 2023. See PSR ¶¶ 55-57, at 18-19.

### 2.    Garcia's Objections.

On August 6, 2024, Garcia files his Objections. See Objections at 4. Garcia argues that the PSR states incorrectly that Garcia's total offense level is 11, because the USPO should have incorporated a 4-level decrease in Garcia's total offense level under § 2P1.1(b)(3). See Objections

at 1.  U.S.S.G. § 2P1.1 provides offense levels for escape crimes.  See U.S.S.G. § 2P1.1.  Section 2P1.1(a)(1) calculates a base offense level of 13 when a defendant escapes from custody or confinement stemming from the defendant's arrest on a felony charge or conviction on any offense. See U.S.S.G. § 2P1.1(a)(1).  Section 2P1.1(b)(3) lowers an offense level by four levels if a defendant, whose base offense level is calculated under § 2P1.1(a)(1), escapes from "the non-secure custody of a community corrections center, community treatment center, 'halfway house,' or similar facility."  U.S.S.G. § 2P1.1(b)(3).  Section 2P1.1(b)(3) states, however, that the 4-level reduction "shall not apply if the defendant, while away from the facility, committed any federal, state, or local offense punishable by a term of imprisonment of one year or more." U.S.S.G. § 2P1.1(b)(3).

Garcia does not object to ¶ 16, at 5, where the USPO calculates a base offense level of 13 under § 2P1.1(a)(1).  See Objections at 1-4.  Garcia also does not object to ¶ 23, at 6, where the USPO applies a 2-level reduction for acceptance of responsibility, under U.S.S.G. § 3E1.1(a), to Garcia's base offense level.  Garcia argues, however, that the USPO should have reduced his offense level by 4 additional levels under § 2P1.1(b)(3), because: (i)  Diersen Center is a non-secure facility, under § 2P1.1(b)(3); and (ii) the United States does not prove -- by a preponderance of the evidence -- that Garcia committed any of the felonies described in ¶¶ 55-57, at 18-19, after he left Diersen Center.  See Objections at 1-3.  Although Garcia denies the factual allegations in ¶¶ 55-56, at 18-19, Garcia does not identify which factual allegations he challenges, or provide any contrary allegations or evidence that undermine ¶¶ 55-56, at 18-19.  See Objections at 2. Garcia similarly denies the factual allegations in ¶ 57, at 19 -- which describe Garcia's December 29, 2023, flight from custody in downtown Albuquerque -- without providing any contrary allegations or evidence.  See Objections at 3.  Garcia also provides a legal argument regarding ¶ 57, at 19:  Garcia's actions, as the PSR alleges, do not constitute a felony under New Mexico

law, because he only attempts to escape from custody.  See Objections at 3.  Garcia asserts that, although escaping a peace officer's custody is a fourth-degree felony, attempting a fourth-degree felony is only a misdemeanor.  See Objections at 3.  Garcia argues that, because his December 29, 2023, flight from custody is only a misdemeanor that carries a maximum sentence of less than one year, his actions do not nullify § 2P1.1(b)(3)'s 4-level reduction, which "shall not apply if the defendant, while away from the facility, committed any federal, state, or local offense punishable by a term of imprisonment of one year or more."  U.S.S.G. § 2P1.1(b)(3).  See Objections at 3-4. Accordingly, Garcia asks the Court to apply § 2P1.1(b)(3)'s 4-level reduction, because the United States does not show -- by a preponderance of the evidence -- that Garcia committed any felonies after he escapes from Diersen Center.  See Objections at 3-4.

> **3.**  **The PSR Addendum.**

On August 9, 2024, the USPO files the PSR Addendum.  See PSR Addendum at 1.  The USPO stands by Garcia's total offense level and argues that the § 2P1.1(b)(3) 4-level reduction does not apply.  See PSR Addendum at 2-3.  The USPO maintains that Garcia commits several felonies after escaping Diersen.  See PSR Addendum at 2-3.  The USPO asserts that, on October 7, 2023, Garcia commits three felonies: (i) attempted armed robbery, in violation of N.M.S.A. § 30-28-1; (ii) conspiracy to commit armed robbery, in violation of N.M.S.A § 30-28-2; and (iii) aggravated battery with a deadly weapon, in violation of N.M.S.A § 30-3-5(C).  See PSR Addendum at 2; Arrest Warrant #1 at 4.  The USPO asserts that, on December 28, 2023, Garcia commits three felonies: (i) possession of a firearm by a felon, in violation of N.M.S.A § 30-7-16; (ii) receiving or transferring stolen vehicles or motor vehicles, in violation of N.M.S.A § 30-16-D-4; and (iii) aggravated battery on a peace officer, in violation of N.M.S.A § 30-22-25(B). See PSR Addendum at 2; State of New Mexico Uniform Incident Report at 2, filed August 9, 2024 (Doc. 31-2)("Police Report #1"); Arrest Warrant #2 at 2.  The USPO asserts that, on December

29, 2023, Garcia commits one felony: escape from custody of a peace officer, in violation of N.M.S.A § 30-22-10.  See PSR Addendum at 3; State of New Mexico Supplemental Officer Report at 1, filed August 9, 2024 (Doc. 31-3)("Police Report #2").  The USPO argues that, because Garcia commits several felonies after escaping Diersen Center, the § 2P1.1(b)(3) 4-level reduction does not apply.

**4.    The Objections Response.**

On August 13, 2024, the United States files the Objections Response.  See Objections Response at 1.  Like the USPO, the United States argues that the § 2P1.1(b)(3) 4-level reduction does not apply, because Garcia commits several felonies after escaping Diersen Center.  See Objections Response at 7-9.  The United States also agrees with the USPO those seven felonies are: (i) attempted armed robbery, conspiracy to commit armed robbery, and aggravated battery with a deadly weapon on October 7, 2023; (ii) possession of a firearm by a felon, receiving or transferring a stolen motor vehicle, and aggravated battery upon a peace officer on December 28, 2023; and (iii) escape from custody of a police officer on December 29, 2023.  See Objections Response at 7-9.

**5.    The Hearings.**

The Court holds a hearing on November 14, 2024.  See November 14, 2024, Hearing Minutes at 1.  At the hearing, Garcia clarifies his ¶ 56, at 18, objection, which addresses the armed standoff with police on December 28, 2023.  See Draft Transcript of November 14, 2024, Hearing at 4:17-15:5 (Fooks, Court)(taken November 14, 2024)("November 14, 2024, Tr.").[9]  Garcia insists that he is not the driver of the gray car who rams the car into a police car and exits the vehicle with a firearm.  See November 14, 2024, Tr. at 5:5 (Fooks); id. at 18:6-22 (Fooks).  Garcia asserts that

---

[9]The Court's citations to the draft transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

another individual -- Daniel Drake -- is the driver.  See November 14, 2024, Tr. at 18:6-22 (Fooks).

To support Garcia's assertion, Garcia's lawyer describes his conversations with Victoria Lambert,

who is sitting in the front passenger seat.  See November 14, 2024, Tr. at 5:5 (Fooks); Police

Report #1 at 8.  Although Garcia files a subpoena for Lambert's testimony on November 14, 2024,

Lambert does not show up to the November 14, 2024, hearing.  See November 14, 2024, Tr. at

5:7-9 (Fooks).  Garcia's lawyer says that, at a later date, Lambert will testify that Drake is the

driver and that Garcia is in the back seat.  See November 14, 2024, Tr. at 18:6-22 (Fooks).  Garcia's

counsel admits that other aspects of ¶ 56, at 19, are true: Garcia is in the house, he runs away from

the house, and the K9 bites him.  See November 14, 2024, Tr. at 18:6-22 (Fooks).  Garcia

maintains, however, that Drake and not Garcia drives the gray car into the police vehicle, and that

Drake and not Garcia is the one who runs into the house after the crash while holding a firearm.

See November 14, 2024, Tr. at 18:6-22 (Fooks).  Regarding his ¶ 55, at 18, objection -- which

addresses the October 7, 2023, armed robbery incident -- Garcia argues that the United States has

not satisfied its preponderance burden, because the United States initially believed another

individual was the perpetrator, only one witness -- Gomez -- implicates Garcia, and Canero, the

victim, cannot identify his assailant.   See November 14, 2024, Tr. at 7:11-10:23 (Fooks).

Regarding his ¶ 57, at 19, objection, Garcia repeats his legal argument: Garcia only attempts to

escape, which is a misdemeanor in New Mexico.  See November 14, 2024, Tr. at 5:16-6:1 (Fooks)

At the next hearing, Garcia represents that he will not call Lambert as a witness to testify

who is driving the gray car on December 28, 2023.  See Draft Transcript of November 25, 2024,

Hearing at 3:24-4:5 (Fooks)(taken November 25, 2024)("November 25, 2024, Tr.").

Notwithstanding Lambert's cold feet, the Court says that it is inclined to sustain Garcia's ¶ 56, at

19, objection, because dash cam video of the incident does not clearly identify Garcia as the driver

who exits the gray car with a firearm.  See November 25, 2024, Tr. at 4:17-22 (Court); Bates

Number 27 at 0:00-0:05 ("Dash Cam Video").[10]  In response, the United States argues that, even

if the Court sustains Garcia's ¶ 56, at 19, objection, the Court should overrule Garcia's other two

objections and conclude that the § 2P1.1(b)(3) 4-level reduction does not apply, because Garcia

commits several other felonies on October 7, 2023, and December 29, 2023.  See November 25,

2024, Tr. at 4:23-5:23 (Armijo).

## LAW REGARDING OBJECTIONS TO A PRESENTENCE REPORT

Before the Court imposes a sentence, the USPO "must conduct a presentence investigation

and submit a report to the court . . . ."  Fed. R. Crim. P. 32(c)(1).  A PSR must apply the advisory

sentencing Guideline, meaning that it must:

(A)    identify all applicable guidelines and policy statements of the Sentencing
       Commission;

(B)    calculate the defendant's offense level and criminal history category;

(C)    state the resulting sentencing range and kinds of sentences available;

(D)    identify any factor relevant to:

       (i)     the appropriate kind of sentence, or

       (ii)    the appropriate sentence within the applicable sentencing range; and

       (iii)   identify any basis for departing from the applicable sentencing
               range.

Fed. R. Crim. P. 32(d)(1).  A presentence report also must provide additional information,

including:

(A)    the defendant's history and characteristics, including:

       (i)     any prior criminal record;

       (ii)    the defendant's financial condition; and

       (iii)   any circumstances affecting the defendant's behavior that may be
               helpful in imposing sentence or in correctional treatment;

---

[10]The United States Probation Office has provided the Court with this video.

(B)    information that assesses any financial, social, psychological, and medical impact on any victim;

(C)    when appropriate, the nature and extent of nonprison programs and resources available to the defendant;

(D)    when the law provides for restitution, information sufficient for a restitution order;

(E)    if the court orders a study under 18 U.S.C. § 3552 (b), any resulting report and recommendation;

(F)    a statement of whether the government seeks forfeiture under Rule 32.2 and any other law; and

(G)    any other information that the court requires, including information relevant to the factors under 18 U.S.C. § 3553(a).

Fed. R. Crim. P. 32(d)(2).

After the USPO files a PSR, the parties have an opportunity to object to the report. See Fed. R. Crim. P. 32(f). Parties must make their objections in writing within fourteen days of receiving the PSR. See Fed. R. Crim. P. 32(f)(1). Parties may object to many aspects of the PSR, "including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report." Fed. R. Crim. P. 32(f)(1). For example, a party can object to a PSR's statement of facts. See, e.g., United States v. Garcia, No. CR 20-1370 KWR, 2022 WL 2341670 (D.N.M. June 29, 2022)(Riggs, J.)(sustaining in part and overruling in part a defendant's objections that a PSR misstates material facts regarding the posted speed limit and the circumstances surrounding the victim's injuries). If a party raises a factual objection, it must present "information to cast doubt on" the PSR's recitation of the facts. See United States v. Yates, 22 F.3d 981, 989 (10th Cir. 1994). A party also can object that the USPO miscalculates a defendant's criminal history category. See, e.g., United States v. Chavez, No. CR 18-0836 JB, 2018 WL 6621283 (D.N.M. December 18, 2018)(Browning, J.)(addressing a defendant's objections that the Court should reduce his criminal history score by several points). Similarly, a

party can object that a PSR impermissibly applies a base-offense-level enhancement, see, e.g., United States v. Casias-Grove, No. 22-0109 JB, 2022 WL 17830249 (D.N.M. December 21, 2022)(Browning, J.)(sustaining a defendant's objection that the PSR impermissibly applies a 4-level enhancement to his base-offense-level); that the PSR should have applied an additional base-offense-level enhancement, see, e.g., United States v. Talk, No. CR 19-1994 JB, 2021 WL 1978624 (D.N.M. May 18, 2021)(Browning, J.)(sustaining the United States' objection that the PSR should have applied a 4-level enhancement to the defendant's base offense level); or that the PSR should have applied a base offense level decrease, see, e.g., United States v. Pena, Nos. CR 19-3609 JB, CR 19-3611 JB, 2022 WL 16924000 (D.N.M. November 13, 2022)(Browning, J.)(sustaining the parties' objections that the PSR should have applied a 2-level reduction to the defendant's base offense level).

Ideally, the parties and the USPO can work through objections without the Court's assistance. Rule 32(f)(3) establishes: "After receiving objections, the probation officer may meet with the parties to discuss the objections. The probation officer may then investigate further and revise the presentence report as appropriate." Fed. R. Civ. P. 32(f)(3). In keeping with rule 32(f)(3), long ago in the District of New Mexico, the Court, the United States Attorney's Office, and the Federal Public Defender's Office agreed that, if there are objections, counsel first will talk to the USPO and see if they can work to address the objections independently. If the parties and the USPO cannot work out an objection, then the parties may file an objection with the Court. If the parties and the USPO cannot resolve an objection, rule 32(g) establishes that, "[a]t least 7 days before sentencing, the probation officer must submit to the court and to the parties the presentence report and an addendum containing any unresolved objections, the grounds for those objections, and the probation officer's comments on them." Fed. R. Crim. P. 32(g).

If the parties and the USPO cannot resolve an objection on their own, the Court "must . . . rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). When resolving factual objections, the court must determine whether the United States has met its burden of proving disputed facts by a preponderance of the evidence. See United States v. Munoz-Tello, 531 F.3d 1174 (10th Cir. 2008). Similarly, in considering objections to enhancements to a defendant's criminal history category or base offense level, the court must determine whether the United States has met its burden of showing that a particular enhancement applies by a preponderance of the evidence.[11] See United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.). The Court may base its conclusion "on evidence presented at trial, undisputed statements in the PSR, and evidence presented at the sentenc[ing] hearing." United States v. Garcia, 2022 WL 2341670, at *2 (quoting United States v. White, 663 F.3d 1207, 1216 (11th Cir. 2011)).

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court of the United States reaffirms the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481 (emphasis in original). The Supreme Court cautions, however, that the Constitution of the United States of America limits this discretion and that the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New

---

[11]There is some nuance regarding the applicable burden of proof required for sentencing enhancements, which the Court discusses in greater detail in the next section.

Jersey, 530 U.S. at 490. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborates on its holding in Apprendi v. New Jersey, stating that the "'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington, 542 U.S. at 303 (emphasis in original)(first citing Ring v. Arizona, 536 U.S. 584, 602 (2002); and then citing Harris v. United States, 536 U.S. 545, 563 (2002)(plurality opinion), overruled by Alleyne v. United States, 570 U.S. 99 (2012)). In United States v. Booker, however, the Supreme Court holds that, because the sentencing guideline ranges are no longer mandatory, "Apprendi does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing United States v. Booker, 543 U.S. at 259). See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of Apprendi's requirement." (quoting United States v. Booker, 543 U.S. at 221)(United States v. Booker adds second alteration)). More recently, the Supreme Court holds that the Apprendi v. New Jersey requirements apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne v. United States, 570 U.S. at 103.

        In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit holds that Blakely v. Washington and United States v. Booker do not change the district court's enhancement-findings analysis. See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involves plain-error review of a drug sentence in which a jury finds the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine. See 408 F.3d at 676. As part of its verdict, the jury, through a special interrogatory, attributes to the defendant 50 to 500 grams of methamphetamine; at sentencing, however, the judge -- based on the testimony of the United States' witnesses about the various

amounts that they had sold to the defendant -- attributes 1,200 grams of methamphetamine to the defendant and uses that amount to calculate his sentence under the Guidelines. See United States v. Magallanez, 408 F.3d at 682. The district court's findings increase the defendant's Guidelines sentencing range from 63 to 78 months, based on the jury's 50 grams amount, to 121 to 151 months, based on the judge's 1,200 grams amount. See United States v. Magallanez, 408 F.3d at 682-83. On appeal, the Tenth Circuit states that, both before and after Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." United States v. Magallanez, 408 F.3d at 684. Although United States v. Booker makes the Guidelines ranges "effectively advisory," United States v. Booker, 543 U.S. at 245, the Tenth Circuit reaffirms that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." United States v. Magallanez, 408 F.3d at 685.

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[12] "[T]he application of an enhancement . . . does not implicate

---

[12]Although the Tenth Circuit states in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit since characterizes its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not found yet that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof

the Supreme Court's holding in <u>Apprendi v. New Jersey</u>." <u>United States v. Reyes-Vencomo</u>, No. CR 11-2563 JB, 2012 WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies <u>Apprendi v. New Jersey</u>'s requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." <u>United States v. Price</u>, 400 F.3d 844, 847 (10th Cir. 2005). <u>Accord</u> <u>United States v. Ray</u>, 704 F.3d at 1314. A defendant may assert an error under <u>Apprendi v. New Jersey</u> only where the fact at issue increases his or her sentence beyond the statutory maximum. <u>See</u> <u>United States v. O'Flanagan</u>, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not assert an error under <u>Apprendi v. New Jersey</u>, because "his sentence does not exceed the statutory maximum"); <u>United States v. Hendrickson</u>, 592 F. App'x 699, 705 (10th Cir. 2014)(holding that, after <u>Alleyne v. United States</u>, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence"). The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in <u>Alleyne v. United States</u> . . . expands the rule from <u>Apprendi v. New</u>

---

is necessary to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement does not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). <u>See</u> <u>United States v. Constantine</u>, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); <u>United States v. Valdez</u>, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitles the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); <u>United States v. Washington</u>, 11 F.3d at 1516 (concluding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributes, even though its findings increase the defendant's sentence from twenty years to consecutive forty-year terms). Subsequent to <u>United States v. Washington</u>, the Tenth Circuit reiterates the position that preponderance of the evidence is the proper standard, stating: "The Supreme Court has not adopted a heightened standard of proof at sentencing for contested facts, thus we hold that the correct standard of proof in this case was a preponderance of the evidence. This issue has been foreclosed in this Circuit." <u>United States v. Robertson</u>, 946 F.3d 1168, 1171 (10th Cir. 2020)(citing <u>United States v. Constantine</u>, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)).

Jersey, . . . (holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence.  See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. August 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, 59 F. Supp. 3d at 1315.  The Supreme Court has clarified that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the legally prescribed penalty.' . . . And under our Constitution, when 'a finding of fact alters the legally prescribed punishment so as to aggravate it,' that finding must be made by a jury of the defendant's peers beyond a reasonable doubt."  United States v. Haymond, 588 U.S. 634, 645 (2019)(quoting Alleyne v. United States, 570 U.S. at 112-14).  Further, the Tenth Circuit has determined that a district court can use its own finding on drug quantity to enhance a defendant's Guidelines range consistent with Alleyne v. United States, "so long as the court does not use its own drug quantity finding to alter the defendant's statutory sentencing range."  United States v. Cassius, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, n.1(I).  In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America notes:

Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis, alterations, and first ellipsis in original; second ellipses added by this District Court)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be determined" based on the following:

> (A)   all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B)   in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2)   solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> (3)   all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4)   any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The Guidelines "allow courts to consider conduct which is not formally charged or is not an element of the offense of conviction."  United States v. Tagore, 158 F.3d 1124, 1128 (10th Cir. 1998).  Conduct is relevant when it is "the same type of conduct," or part of "the same scheme or plan," as the conviction offenses.  United States v. Custodio, 39 F.3d 1121, 1126 (10th Cir. 1994).  The conduct that a sentencing court may consider, therefore,

"comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct." United States v. Allen, 488 F.3d 1244, 1254-55 (10th Cir. 2007). "Section 1B1.3 embodies the principle that the sentence should reflect the offense's seriousness, and so courts should consider all conduct relevant to determining that seriousness." United States v. Nissen, 492 F. Supp. 3d 1254, 1272 (D.N.M. 2020)(Browning, J.)(citing United States v. Allen, 488 F.3d at 1255).

Pursuant to U.S.S.G. § 6A1.3's commentary, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct. See U.S.S.G. § 6A1.3 cmt. The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning, J.), aff'd, 523 F.3d 1258 (10th Cir. 2008). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct consists primarily of two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997). In Witte v. United States, the Supreme Court upholds the use of uncharged conduct at sentencing against a double-jeopardy challenge. See 515 U.S. at 404-06. The defendant in Witte v. United States had been involved in an unsuccessful attempt to import marijuana and cocaine into the United States in 1990, and in an attempt to import marijuana in 1991. See 515 U.S. at 392-93. In March 1991,

a federal grand jury indicts the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's later attempt to import narcotics. See 515 U.S. at 392-93. At sentencing, the district court concludes that, because the 1990 attempt is part of the continuing conspiracy, it is relevant conduct under U.S.S.G. § 1B1.3, and thus calculates the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes. See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicts the defendant for conspiring and attempting to import cocaine in association with his activities in 1990. See 515 U.S. at 392-93. The defendant moves to dismiss the indictment, contending that he already has been punished for the cocaine offenses, because the district court has considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense. See 515 U.S. at 395. The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution. See Witte v. United States, 515 U.S. at 395. The United States Court of Appeals for the Fifth Circuit reversed and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct." United States v. Wittie, 25 F.3d 250, 258 (5th Cir. 1994). In reaching this holding, the Fifth Circuit acknowledges that its conclusion is contrary to other United States Courts of Appeals opinions, including a United States Court of Appeals for the Tenth Circuit opinion, that had previously considered this question. See United States v. Wittie, 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court grants certiorari to resolve the conflict between the Courts of Appeals and affirms the Fifth Circuit decision. See Witte v. United States, 515 U.S. at 395. In holding that a district court's consideration of the defendant's relevant conduct does not punish the defendant

for that conduct, the Supreme Court concludes that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted." 515 U.S. at 401 (internal quotations have no citation). The Supreme Court reasons that sentencing courts always have considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense." 515 U.S. at 402. Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity." Witte v. United States, 515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relies upon Witte v. United States and upholds, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant has been acquitted. See United States v. Watts, 519 U.S. at 149. The Supreme Court notes that its conclusion is in accord with every United States Court of Appeals other than United States Court of Appeals for the Ninth Circuit, and that each Court of Appeals previously has held that a sentencing court may consider conduct for which the defendant has been acquitted, if the government establishes that conduct by a preponderance of the evidence. See United States v. Watts, 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)). The Supreme Court begins its analysis with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." United States v. Watts, 519 U.S. at 151 (quoting 18 U.S.C. § 3661). According to the Supreme Court, 18 U.S.C. § 3661 embodies the

codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit caselaw adheres closely to the Supreme Court's results in Witte v. United States and in United States v. Watts. See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause). In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006), the Tenth Circuit rejects a defendant's argument that it is "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard." 168 F. App'x at 290. The Tenth Circuit explains that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment. Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'" United States v. Banda, 168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant appeals the district court's sentence enhancement for firearms possession after he is convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but is acquitted of using or carrying a firearm during and in relation to a drug trafficking crime. See 947 F.2d at 1428. The Tenth Circuit acknowledges that courts have taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal on firearms charges. See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(Green, J.)(refusing to apply 2-

level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).  Without discussion related to the standard of proof that a sentencing court should use to make factual findings, the Tenth Circuit holds that the district court does not err in enhancing the defendant's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit bases its conclusion on evidence that: (i) individuals at the arrest scene handle the weapons; (ii) individuals who live at the house handle the weapons; and (iii) the weapons are kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429. The Tenth Circuit summarizes that, in reviewing relevant federal case law, it finds "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." 947 F.2d at 1429.

In United States v. Washington, 11 F.3d at 1510, the defendant argues that the United States needs to prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objects to his sentencing, because the drug quantity that the district court considers as relevant conduct, and which the court finds by a preponderance of the evidence, increases his Guidelines sentencing range from 210-262 months to life in prison.  See 11 F.3d at 1515.  The defendant argues "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  United States v. Washington, 11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[s] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it holds that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard."  11 F.3d at 1516 (citing

McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).  See United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1319 (D.N.M. 2014)(Browning, J.)(cross-referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime); United States v. Sangiovanni, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. August 29, 2014)(Browning, J.)(concluding that a sentencing court can cross-reference from the guidelines that correspond to the defendant's crime of conviction to the guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime);

The Court has held that, while not drawing an adverse inference from the refusal, it may consider a defendant's refusal to answer questions for the PSR.  See United States v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. February 13, 2012)(Browning, J.).  The Court also has held that, although it can consider a defendant's silence about information regarding herself or others engaging in criminal conduct, it will not rely on that silence to increase the defendant's sentence.  See United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814, at *13 n.5 (D.N.M. June 22, 2012)(Browning, J.).  Finally, the Court has held that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence. United States v. Romero, No. CR 09-1253 JB, 2012 WL 6632493, at *23 (D.N.M. December 6, 2012)(Browning, J.).  See United States v. Tapia, No. CR 12-3012 JB, 2017 WL 6417610, at *10-15 (D.N.M. December 14, 2017)(Browning, J.).

## LAW REGARDING HEARSAY IN REVOCATION HEARINGS

"The Sixth Amendment [to the Constitution of the United States of America] is a trial right and does not apply to pretrial proceedings."  United States v. Hernandez, 778 F. Supp. 2d 1211,

1225 (D.N.M. 2011)(Browning, J.). The Tenth Circuit suggests that the Sixth Amendment applies only to trial proceedings. See United States v. Bustamante, 454 F.3d 1200, 1202 (10th Cir. 2006). Rule 32.1 of the Federal Rules of Criminal Procedure gives the defendant at the revocation hearing "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C). Rule 32.1's notes instruct courts to apply a balancing test that weighs "the person's interest in the constitutionally guaranteed right to confrontation against the government's good cause for denying it." Rule 32.1 Advisory Committee's Note to the 2012 Amendment. The Tenth Circuit has adopted the balancing test "when determining a releasee's confrontation rights at a revocation hearing." United States v. Jones, 818 F.3d 1091, 1099 (10th Cir. 2016). When applying the balancing test, the court must weigh the defendant's interest in cross-examining and confronting the witness with the United States' good cause for not presenting the witness. See United States v. Jones, 818 F.3d at 1098 (citing Rule 32.1's Advisory Committee Note to the 2002 Amendment). Moreover, the due process guarantees at revocation hearings are minimal, and "the process should be flexible enough to consider evidence . . . that would not be admissible in an adversary criminal trial." Morrissey v. Brewer, 408 U.S. 471, 485 (1972). See United States v. Henry, 852 F.3d 1204, 1206 (10th Cir. 2017). See also Gagnon v. Scarpelli, 411 U.S. 778, 782 n.5 (1973)("While in some cases there is simply no adequate alternative to live testimony, we emphasize that we did not in Morrissey intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence.")

The Tenth Circuit also notes that "'reliability is a very important factor in determining the strength of a releasee's confrontation right.'" United States v. Jones, 818 F.3d at 1098 (quoting Curtis v. Chester, 626 F.3d 540, 546 (10th Cir. 2010)). In United States v. Jones, the Tenth Circuit

concludes that the district court abuses its discretion by not applying the rule 32.1(b)(2)(C) balancing test when it states that it "weighed the reliability of the hearsay evidence against the 'gravity of the matter.'" United States v. Jones, 818 F.3d at 1100 (quoting Record on Appeal, Vol. I at 43). The Tenth Circuit advises that "reliability is relevant to determine [the defendant's] interest in confrontation," but that a district court should also consider the defendant's interest in cross-examination. United States v. Jones, 818 F.3d at 1100-01. Further, the Tenth Circuit notes that the balancing test's second part includes the district court's consideration of "the Government's explanation for failing to present . . . [the] witness." United States v. Jones, 818 F.3d at 1101. See United States v. Murphy, 769 F. App'x 631, 633-34 (10th Cir. 2019)(noting that the Tenth Circuit says that "the 'reliability' of the hearsay statements and the defendant's 'interest in cross-examination' are relevant to the defendant's interest in confrontation," and that a court should "weigh these considerations against 'the Government's explanation for failing to present' a witness")(quoting United States v. Jones, 818 F.3d at 1100-01). Moreover, in United States v. Henry, 852 F.3d 1204 (10th Cir. 2017), the Tenth Circuit again emphasizes that both rule 32.1 and United States v. Jones mandate that the district court conduct a balancing test rather than merely citing the standard. See United States v. Henry, 852 F.3d at 1208. See also United States v. Davis, 802 F. App'x 318, 323 (10th Cir. 2020)("There is reason to doubt the government's assertion the district court satisfied its obligation to balance the factors set out in Rule 32.1(b)(2)(C) by merely granting the government's motion to adduce hearsay evidence.").

In United States v. Hernandez, 428 F. Supp. 3d 775 (D.N.M. 2019)(Browning, J.), the Court conducts the rule 32.1 balancing test regarding testimony in Hernandez' revocation hearing for which Hernandez allegedly violates his supervised release by committing two crimes: battery of a household member and criminal damage to property. See 428 F. Supp. 3d at 780. In

considering Hernandez' interest in confronting three witnesses who were absent from Hernandez'

revocation hearing, the Court states:

> First, Hernandez, like any defendant, has an interest in confronting individuals testifying against him, and he has a[] special need to confront Angulo.[13]  See United States v. Jones, 818 F.3d at 1099-100.  Like the defendant in United States v. Jones, Hernandez has a[] special need to confront Angulo because of two "textbook bases for cross-examin[ing]": (i)"exploring possible bias," because of her relationship with Hernandez; and (ii) "asking why [Angulo] refused to cooperate in the state" case, "a matter on which the parties and the court could only posit educated guesses without her testimony."  United States v. Jones, 818 F.3d at 1101.  Moreover, "generally recognized concerns with eyewitness testimony" strengthen Hernandez' interest in confronting Angulo.  See United States v. Jones, 818 F.3d at 1101.  Second, Hernandez has an interest in confronting the Rio Rancho police officer who conveyed the information from Angulo's call to the responding officers, but the Court concludes that his interest in confronting this police officer is mitigated by the reliability of the Rio Rancho Police Department in calling officers to the scene of the crime and conveying facts about the crime scene to other officers.  Such information may raise some reliability concerns, however, because a third party might have given the Rio Rancho Police Department officer information about the incident.  Third, Hernandez has an interest in confronting his sister M. Hernandez, who described Hernandez' alleged assault of Angulo to the responding officers.   M. Hernandez' familial relationship with Hernandez heightens her potential bias. Hernandez, thus, has an interest in confronting Angulo, the Rio Rancho police officer, and M. Hernandez.

United States v. Hernandez, 428 F. Supp. 3d at 788-89.  The Court then considers the United

States' reason for not presenting the witnesses at Hernandez' revocation hearing.  See 428 F. Supp.

3d at 789.  First, the Court notes that "the United States was silent as to Angulo's absence."  428

F. Supp. 3d at 789.  While the United States notes that Angulo moved to California and will not

cooperate in the state battery case, the Court concludes "that information supports only

speculation." 428 F. Supp. 3d at 789.  Consequently, the Court concludes that "Hernandez' need

to confront Angulo outweighs the United States' good cause for her absence."  United States v.

Hernandez, 428 F. Supp. 3d at 789.  Second, the Court notes: "The United States has not given

---

[13]Brianna Angulo is Hernandez' girlfriend, whom the United States alleges Hernandez punched in the face, leading to the charge for battery of a household member.  See United States v. Hernandez, 428 F. Supp. 3d at 780.

any reason to explain the Rio Rancho Police Department officer's absence or M. Hernandez' absence." 428 F. Supp. 3d at 789 (citing United States v. Jones, 818 F.3d at 1102 (concluding that fear of retaliation does not explain adequately a witness' absence where the United States does not ask or subpoena the witness to attend)).

In United States v. Francis, No. CR 16-4222 WJ, 2022 WL 601137 (D.N.M. March 1, 2022)(Johnson, C.J.), the Honorable William Johnson, then-Chief United States District Judge for the United States District Court for the District of New Mexico, performs the rule 32.1 balancing test when the defendant "requested this Court to reconsider its finding that he committed domestic violence and battery," which resulted in his supervised release revocation. 2022 WL 601137 at *1. Chief Judge Johnson first weighs the defendant's interest:

> Defendant certainly had an interest in cross examining Jane Doe regarding a text message she sent to Defendant about an allegedly abusive ex-boyfriend, the lack of background noise indicating violence on the 911 call, the timeline of when her injuries were documented, and her failure to appear at a pretrial interview.

2022 WL 601137 at *2. Chief Judge Johnson also notes that the "Government refrained from calling Jane Doe at the revocation hearing to avoid interfering with the tribal court prosecution" that concerns the defendant's same underlying conduct that led to the revocation hearing. 2022 WL 601137 at *2. Finally, Chief Judge Johnson considers the hearsay's reliability, and notes that the victim's statements were captured on an officer's lapel camera, were consistently given to different officers, and "her description of the battery matched the visible injuries on her body." 2022 WL 601137 at *2. Consequently, Chief Judge Johnson declines to reverse his previous ruling that the hearsay statements are admissible. See 2022 WL 601137 at *2.

Although rule 32.1 of the Federal Rules of Criminal Procedure and the Jones balancing test are geared toward decreasing procedural protections for defendants in revocation hearings and increasing the universe of evidence courts can consider in those hearings, in practice, rule 32.1 and Jones may limit evidence unnecessarily and unwisely. In some instances, courts presiding over

revocation hearings may be compelled to disregard out-of-court statements even though those same out-of-court statements would be admissible under the Federal Rules of Evidence and Crawford if they were offered at trial, regardless whether the declarant is available to testify at the trial.  Those instances are troubling for two reasons. First, defendants in those cases are provided with a greater right to confrontation in the revocation context than they are in the trial context.  It is difficult -- if not impossible -- to square that outcome with the Tenth Circuit's guidance that defendants are supposed to have a more limited right to confrontation in the revocation setting than they do in the trial setting.  See Jones, 818 F.3d at 1098.  Second, courts in those cases are forced to rely on smaller universes of evidence than they would be able to consider in the trial setting. Again, it is difficult -- if not impossible -- to reconcile that result with the Supreme Court's guidance in Morrissey v. Brewer that courts presiding over revocation hearings should be able to consider "material that would not be admissible in an adversary criminal trial."  408 U.S. at 489.

The Honorable Andrew S. Oldham, United States Circuit Judge for the United States Court of Appeals for the Fifth Circuit, documents this paradox in his concurring opinion in United States v. Alvear, 959 F.3d 185, 191 (5th Cir. 2020)(Oldham, J., concurring).  In his concurrence, Judge Oldham discusses "three oddities" in rule 32.1 caselaw.  United States v. Alvear, 959 F.3d at 193 (Oldham, J., concurring).[14]  First, he notes that "it's unclear what if anything the Due Process Clause adds to the protections of Rule 32.1(b)(2)(C)."  United States v. Alvear, 959 F.3d at 193 (Oldham, J., concurring).  Second, he observes that, "instead of applying Rule 32.1(b)(2)(C), many

---

[14]The Fifth Circuit does not use the Jones test.  It uses, however, a balancing test analogous to Jones test, as does every other Court of Appeals that has handled a rule 32.1 issue.  See United States v. Taveras, 380 F.3d 532, 536 (1st Cir. 2004); United States v. Chin, 224 F.3d 121, 124 (2d Cir. 2000); United States v. Lloyd, 566 F.3d 341, 344 (3d Cir. 2009); United States v. Doswell, 670 F.3d 526, 530 (4th Cir. 2012); Barnes v. Johnson, 184 F.3d 451, 454 (5th Cir. 1999); United States v. Jackson, 422 Fed. App'x 408, 410-11 (6th Cir. 2011)(unpublished); United States v. Jordan, 742 F.3d 276, 279 (7th Cir. 2014); United States v. Bell, 785 F.2d 640, 642 (8th Cir. 1986); United States v. Comito, 177 F.3d 1166, 1170 (9th Cir. 1999); United States v. Frazier, 26 F.3d 110, 114 (11th Cir. 1994); United States v. Stanfield, 360 F.3d 1346, 1360 (D.C. Cir. 2004).

of our decisions in this area contain nary a citation to it." United States v. Alvear, 959 F.3d at 193

(Oldham, J., concurring). Finally, he describes, "oddest of all, sometimes confrontation rights in

a revocation hearing can be *broader* than the confrontation right at trial." United States v. Alvear,

959 F.3d at 193 (Oldham, J., concurring)(emphasis in original).

> The Supreme Court has told us that protections in a revocation hearing are (at most) the same as those at trial. See United States v. Haymond, — U.S. —, 139 S. Ct. 2369, 2378-79 . . . (2019) (plurality opinion); id. at 2385-86 (Breyer, J., concurring in the judgment). That result creates its own difficulties. See id. at 2390-91 (Alito, J., dissenting). But it's an altogether different problem to make the constitutional protections in the revocation hearing broader than at trial. After all, one premise of our system is that post-conviction rights are generally narrower because "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." Herrera v. Collins, 506 U.S. 390, 399 . . . (1993). But when we ask different questions under the Confrontation Clause at trial (is the statement "testimonial"?) and under the Due Process Clause at revocation (is there "good cause" to admit the statement?), we can get incongruous answers.
>
> Consider an example. A boyfriend violently attacks his girlfriend who then immediately calls 911. The Government wants to use her statements to the 911 operator against the boyfriend. At trial, the defendant has no right to prevent the introduction of these statements under the Confrontation Clause because they're not "testimonial." [Ohio v. ]Clark, [576 U.S. 237, 244 (2015)] (citing Davis v. Washington, 547 U.S. 813, 820 . . . (2006)). But this same 911 call is almost certainly hearsay. So at the boyfriend's revocation hearing, he can object to the introduction of the statements under the Due Process Clause, unless there is "good cause" to admit them. See, e.g., [United States v. ]Jimison, 825 F.3d [260,] 263 [(2016)].
>
> The oddities don't end there. The Federal Rules of Evidence apply at trial. And they provide for the admission of all sorts of hearsay: an excited utterance, a statement made for medical treatment, a present sense impression, a business record, a statement against interest. See Fed. R. Evid. 803, 804. But the hearsay rules in the Federal Rules of Evidence do not apply in revocation hearings. Fed. R. Evid. 1101(d)(3) . . . . So if the Government wants to use these same (otherwise-admissible) hearsay statements at a revocation hearing, the court has to apply the "good cause" analysis demanded by the Due Process Clause. That's an additional hurdle that applies post-conviction that does not apply pre-conviction. How odd.

United States v. Alvear, 959 F.3d at 194 (Oldham, J., concurring). In United States v. Calvert-

Cata, the Court agrees with Judge Oldham, and concludes that it may consider and rely upon out-

of-court statements without applying the <u>Jones</u> test if those out-of-court are admissible under the

Federal Rules of Evidence:

> The Court reaches this conclusion because evidentiary standards for revocation hearings are supposed to be more inclusive and flexible than trials.  <u>See</u> <u>Morrissey v. Brewer</u>, 408 U.S. at 489.  Some out-of-court statements are admissible in criminal trials, even if the declarant is available.  <u>See</u> Fed. R. Evid. 803.  Yet, in the revocation context, courts have to run those same out-of-court statements through the <u>Jones</u> analysis and determine whether the United States had "good cause" not to call the declarant at the revocation hearing.  <u>See</u> <u>Jones</u>, 818 F.3d at 1099-100.  "That's an additional hurdle that applies post-conviction that does not apply pre-conviction."  <u>United States v. Alvear</u>, 959 F.3d at 194 (Oldham, J., concurring).  It makes no sense to require the United States to justify why it is not calling a declarant to testify at a revocation hearing, when the United States would not have to justify its decision not to call that same declarant to testify at trial because the declarant's statements would be admissible under the Federal Rules of Evidence and <u>Crawford</u>, regardless of whether the declarant was available to testify.  It is time to "square this circle."  <u>United States v. Alvear</u>, 959 F.3d at 194 (Oldham, J., concurring).  The Court squares the circle by bypassing the <u>Jones</u> balancing test and instead relying on the out-of-court statements that would have been admissible under the Federal Rules of Evidence and <u>Crawford</u> if they were offered at trial.

<u>United States v. Calvert-Cata</u>, No. CR 16-4566 JB, 2022 WL 14813473, at *12 (D.N.M. October

26, 2022)(Browning, J.), <u>aff'd</u>, No. 23-2000, 2024 WL 33901 (10th Cir. January 3, 2024).

## <u>LAW REGARDING RULE 803(2)</u>

Rule 803(2), commonly referred to as the excited utterance exception, provides an

exception to the exclusion of hearsay statements for "[a] statement relating to a startling event or

condition, made while the declarant was under the stress of excitement that it caused."  Fed. R.

Evid. 803(2).  The United States Court of Appeals for the District of Columbia notes that "[t]he

rationale underlying the 'excited utterance' exception is that 'excitement suspends the declarant's

powers of reflection and fabrication, consequently minimizing the possibility that the utterance

will be influenced by self interest and therefore rendered unreliable.'"  <u>United States v. Alexander</u>,

331 F.3d 116, 122 (D.C. Cir. 2003)(quoting <u>United States v. Brown</u>, 254 F.3d 454, 458 (3d Cir.

2001)).  "Thus, to qualify as an excited utterance, 'the declarant's state of mind at the time that the

statement was made [must] preclude[] conscious reflection on the subject of the statement.'"

United States v. Alexander, 331 F.3d at 122 (quoting United States v. Joy, 192 F.3d 761, 766 (7th

Cir. 1999))(brackets in United States v. Alexander, but not in United States v. Joy).  The Tenth

Circuit, in United States v. Smith, 606 F.3d 1270 (10th Cir. 2010), sets forth a district court's

required analysis for whether a statement is admissible under the excited utterance exception:

> The so-called excited-utterance exception has three requirements: (1) a startling
> event; (2) the statement was made while the declarant was under the stress of the
> event's excitement; and (3) a nexus between the content of the statement and the
> event.  There is no precise amount of time between the event and the statement
> beyond which the statement cannot qualify as an excited utterance.  Admissibility
> hinges on a statement's contemporaneousness with the excitement a startling event
> causes, not the event itself.  There is no hard time limit that must be met under Rule
> 803; what is relevant is whether the declarant is still under the excitement of the
> startling event.

States v. Smith, 606 F.3d at 1279.  The Tenth Circuit notes:

> Courts consider a range of factors in determining whether a declarant made a
> statement while under the stress of a particular event.  Among the more relevant
> factors are: the amount of time between the event and the statement; the nature of
> the event; the subject matter of the statement; the age and condition of the declarant;
> the presence or absence of self-interest; and whether the statement was volunteered
> or in response to questioning.

United States v. Pursley, 577 F.3d 1204, 1220 (10th Cir. 2009).  "Permissible subject matter of the

statement is [not] limited . . . to description or explanation of the event or condition . . . .  [T]he

statement need only relate to the startling event or condition, thus affording a broader scope of

subject matter coverage."  United States v. Frost, 684 F.3d 963, 973 (10th Cir. 2012)(first brackets

in original; this District Court adds second bracket)(quoting Fed. R. Evid. 803 Advisory Comm.

Notes).  "If the trial court has access to a recording of the declarant's statement, it may also

consider the declarant's 'tone and tenor of voice' in determining whether the declarant made that

statement while under the stress of excitement."  United States v. Alexander, 331 F.3d at 123

(quoting United States v. Woodfolk, 656 A.2d 1145, 1151 n.16 (D.C. 1995)).

The United States Court of Appeals for the Second Circuit provides an analysis of the similarities and subtle differences between the present sense impression and excited utterance exceptions to the rule against hearsay:

> As defined by the Federal Rules of Evidence, a present sense impression is a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Rule 803(1), Fed. R. Evid. Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory. See United States v. Brewer, 36 F.3d 266, 272 (2d Cir. 1994).
>
> The hearsay exception for excited utterances is premised on a similar, though distinct, assumption that the reliability of a statement increases as opportunity for reflection by the declarant decreases. An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 803(2), Fed. R. Evid. As we have explained, "[t]he rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." [United States v.] Tocco, 135 F.3d [] [116,] 127[ (2d Cir. 1998)]. Unlike present sense impressions, "[a]n excited utterance need not be contemporaneous with the startling event to be admissible." Id. Rather "[t]he length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of rule 803(2), 'under the stress of excitement caused by the event or condition.'" United States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990).
>
> . . . .
>
> Thus while the hearsay exception for present sense impressions focuses on contemporaneity as the guarantor of reliability, and requires that the hearsay statement "describe or explain" the contemporaneous event or condition, Rule 803(1), Fed. R. Evid., the excited utterance exception is based on the psychological impact of the event itself, and permits admission of a broader range of hearsay statements -- i.e. those that "relate to" the event. Rule 803(2), Fed. R. Evid.

United States v. Jones, 299 F.3d 103, 112 & n.3 (2d Cir. 2002).

In Maples v. Vollmer, 2013 WL 1681234 (D.N.M. 2013)(Browning, J.), the plaintiff's "then-boyfriend's daughter" calls 911; in response, the defendant officers arrive at the plaintiff's residence. 2013 WL 1681234, at *1. The plaintiff is in his front yard when the officers arrive; when he tries to walk away from them, the officers chase the plaintiff, who then flees from the

officers.  See 2013 WL 1681234, at *1.  The officers tackle the plaintiff when they catch up to

him, and the plaintiff alleges that the officers used excessive and unnecessary force.  See 2013 WL

1681234, at *1.  The plaintiff files a motion in limine, asking the Court to prohibit the defendants

or their witnesses from disclosing the contents of the 911 call.  See 2013 WL 1681234, at *2.  The

Court concludes that the call was admissible under rule 803(2), noting that it satisfies the three

requirements of the excited-utterance exception to the rule against hearsay:

> The second and third requirements of the excited utterance analysis cannot
> reasonably be challenged under the circumstances surrounding S. Lane's 911 call:
> (i) S. Lane's statements were contemporaneous with the event, and there is thus no
> lapse of time here between the startling event to which S. Lane's statements relate
> and the statements; and (ii) there is a nexus between the statements' content and the
> event, as S. Lane's statements detail the event in real time, explain why the event
> prompted her to call 911, and describe Maples to the 911 operator.

Maples v. Vollmer, 2013 WL 1681234, at *16.  The remaining issue is whether the event to which

they relate -- the plaintiff's "attempt to allegedly wrongfully gain access" to his residence and his

"coming after" the caller's father -- was "a startling event or condition."  2013 WL 1681234, at

*16.

> Professor Stephen A. Saltzburg explains that courts have been quite liberal
> in finding that an event is startling for purposes of rule 803(1):

>> In most cases it is not seriously disputed that the event to which the
>> excited utterance relates is in fact a startling event. Occurrences such
>> as accidents, fights, and physical crimes are generally deemed
>> startling events. However, admissibility under the Rule is not
>> limited to events describing such clearly upsetting occurrences. The
>> Courts have been quite expansive in finding that an event triggered
>> a startled statement is in fact a startling event.

> 4 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Fed. Rules of Evid.
> Manual § 803.02[3][b], at 803-18 (9th ed. 2006)(footnotes omitted).  Professor
> Saltzburg cites David v. Pueblo Supermarket, 740 F.2d 230 (3d Cir. 1984), as an
> "e.g." example to support his proposition that courts have been quite expansive in
> finding a startling event.  In David v. Pueblo Supermarket, the United States Court
> of Appeals for the Third Circuit held that a woman observing another woman, to
> whom she was not related, "who was eight months pregnant fall directly on her
> stomach . . . would reasonably qualify as a 'startling occasion.'"  740 F.2d at 235.
> Another example to which Professor Saltzburg cites is United States v. Beverly,

      369 F.3d 516 (6th Cir. 2006), in which the United States Court of Appeals for the
      Sixth Circuit held that "viewing the photograph of the individual that [the declarant]
      recognized as her husband committing a bank robbery was a startling event."  369
      F.3d at 540.

Maples v. Vollmer, 2013 WL 1681234, at *16.  The Court notes that the caller believes that the

plaintiff is not supposed to be at his residence, that "he had left the hospital when he should not

have, that she was 'pretty sure' he was in the hospital because he was suicidal, and that she believed

[the plaintiff] was at the residence because he was coming after her father."  2013 WL 1681234,

at *16 (quoting the 911 call transcript).  The Court concludes that "[t]hese events are at least as

startling as observing an unrelated person, even a pregnant person, slip in a grocery store."  Maples

v. Vollmer, 2013 WL 1681234, at *16.

## ANALYSIS

      The Court undertakes its analysis in three parts.  First, the Court concludes that the United

States proves, by a preponderance of the evidence, that Garcia commits three felonies -- attempted

armed robbery, conspiracy to commit armed robbery, and aggravated battery with a deadly weapon

-- on October 7, 2023.  Second, the Court concludes that the United States proves, by a

preponderance of the evidence, that Garcia commits one felony -- possession of a firearm by a

felon -- on December 28, 2023.  Third, the Court concludes that the United States proves, by a

preponderance of the evidence, that Garcia commits one felony -- escape from custody of a peace

officer -- on December 29, 2023.  Having determined that the United States proves, by a

preponderance of the evidence, that Garcia commits five felonies after he escaped from the Diersen

Center, the Court overrules the Objections, because the § 2P1.1(b)(3) 4-level reduction does not

apply.

I.    THE UNITED STATES PROVES -- BY A PREPONDERANCE OF THE
EVIDENCE -- THAT GARCIA COMMITS THREE FELONIES ON OCTOBER 7,
2023.

The United States proves -- by a preponderance of the evidence -- that Garcia commits

three felonies on October 7, 2023. Those three felonies are attempted armed robbery, conspiracy

to commit armed robbery, and aggravated battery with a deadly weapon. The Court makes

findings of fact regarding the October 7, 2023, incident. See supra, at 4-7 & n.4. Garcia and

Gomez try to steal Canero's truck at gunpoint, and Garcia hits Canero six to seven times with a

hammer during the ensuing struggle, causing Canero significant injuries. See supra, at 4-7 & n.4.

Trying to steal a truck at gunpoint constitutes an attempted armed robbery, which is a third-degree

felony. See N.M.S.A. § 30-16-2 (defining robbery as "theft of anything of value from the person

of another or from the immediate control of another, by use or threatened use of force or violence,"

and providing that committing a robbery while armed with a deadly weapon is a second-degree

felony); N.M.S.A. § 30-1-12(B) (providing that a firearm is a deadly weapon); State v. Traeger,

2001-NMSC-022, ¶ 12, 130 N.M. 618, 622, 29 P.3d 518, 522 (holding that, "if the item is

specifically listed in Section 30-1-12(B), it is considered a deadly weapon as a matter of law");

N.M.R.A. UJI 14-1621 (listing armed robbery elements); N.M.S.A. § 30-28-1 (defining attempt

as "an overt act in furtherance of and with intent to commit a felony and tending but failing to

effect its commission" and providing that an attempted second-degree felony is a third-degree

felony).

Teaming up with another person, moreover, to steal a truck at gunpoint constitutes

conspiracy to commit armed robbery, which is a third-degree felony. See N.M.S.A. § 30-28-1

(defining conspiracy as "knowingly combining with another for the purpose of committing a

felony" and providing that conspiracy to commit a second-degree felony is a third-degree felony).

Garcia's hammer attack on Canero is also an aggravated battery with a deadly weapon, which is a

third-degree felony.  See N.M.S.A § 30-3-5(C) (defining aggravated battery as "the unlawful touching or application of force to the person of another with intent to injure that person or another," and providing that aggravated battery with a deadly weapon is a third-degree felony). Although a hammer is not specifically listed as a deadly weapon in N.M.S.A. § 30-1-12(B), the Court determines, as a finding of fact, that the hammer is a deadly weapon in this context, because Garcia uses it in a way that can cause death or great bodily harm.  See State v. Traeger, 2001-NMSC-022, ¶ 16, 130 N.M. at 623, 29 P.3d at 523 (holding that: "[i]f the item is not specifically listed" in N.M.S.A. § 30-1-12(B), "then the question of whether the item is a deadly weapon, given the defendant's use and the character of the item, should be submitted to the jury for a finding of fact"); N.M.R.A. UJI 14-322 (providing that a jury may conclude that an aggravated battery defendant uses a deadly weapon "only if you find that [the object], when used as a weapon, could cause death or great bodily harm"); Arrest Warrant #1 at 1 (describing how officers request "emergency medical assistance" after observing a substantial amount of blood on Canero's face and shirt, multiple bleeding contusions on his face, a large bleeding and swollen gash on his left cheek, and raised bumps on his forehead and top of his head).  In sum, the Court concludes that the United States proves -- by a preponderance of the evidence -- that Garcia commits three felonies on October 7, 2023.

II.    **THE UNITED STATES PROVES -- BY A PREPONDERANCE OF THE EVIDENCE -- THAT GARCIA COMMITS ONE FELONY ON DECEMBER 28, 2023.**

The United States proves -- by a preponderance of the evidence -- that Garcia commits one felony on December 28, 2023: possession of a firearm by a felon.  The Court makes findings of fact regarding the December 28, 2023, incident.  See supra, at 8-11 & n.5.  Garcia rams a car into Placencio's marked police vehicle, causing Placencio to shift in his seat, and Garcia exits the car with a firearm.  See supra, at 8-11 & n.5.  For Garcia, a convicted felon, carrying a firearm

constitutes possession of a firearm by a felon, which is a third-degree felony. See N.M.S.A § 30-7-16 (providing that it is a third-degree felony to "receive, transport or possess a firearm" as a felon).[15]

The United States argues that Garcia commits two other felonies on December 28, 2023: aggravated battery upon a peace officer without great bodily harm, and receiving or transferring a stolen motor vehicle. See Objections Response at 6. The United States does not carry its burden, however, to prove that Garcia commits either crime. Regarding aggravated battery upon a peace officer without great bodily harm, the United States does not satisfy two essential elements: intent to injure, and causing either painful temporary disfigurement or temporary loss or impairment use of an organ or body member. See N.M.S.A. § 30-22-25(B) (providing that "unlawful touching or application of force to the person of a peace officer with intent to injure that peace officer while he is in the lawful discharge of his duties" is a fourth-degree felony when the defendant inflicts "an injury to the peace officer which is not likely to cause death or great bodily harm, but does cause painful temporary disfigurement or temporary loss or impairment of the functions of any member or organ of the body"); N.M.R.A. UJI 14-2214 (listing N.M.S.A. § 30-22-25(B)'s

---

[15]Although the USPO and the United States do not advance this observation and argument, the Court notes that the United States proves -- by a preponderance of the evidence -- that Garcia's firearm possession also constitutes a felony under federal law. See 18 U.S.C. § 922(g)(1). The federal felon-in-possession statute has an additional mens rea element requiring the United States to prove that the defendant knows that he cannot possess a firearm. See Rehaif v. United States, 588 U.S. 225, 227 (2019)("To convict a defendant [under 18 U.S.C. § 922(g)], the Government [] must show that the defendant knew he possessed a firearm and also that he knew he had the relevant status when he possessed it."). When the Court sentenced Garcia in 2015, the Court told him that he "is a convicted felon and prohibited from possessing firearms, ammunition, destructive devices or other dangerous weapons." Draft Transcript of December 17, 2025 Hearing at 19:18-20 (Court)(taken December 17, 2025)(The Court's citations to the draft transcript of the hearing refers to the court reporter's original, unedited version; any final transcript may contain slightly different page and/or line numbers). Based on its own, on-the-record statements to Garcia, the Court finds that, on December 28, 2023, Garcia knows that he is a convicted felon who cannot possess a firearm. Thus, the United States proves -- by a preponderance of the evidence -- that Garcia violates 18 U.S.C. § 922(g)(1) as well as its State law analogue, N.M.S.A § 30-7-16.

essential elements). Although Placencio asserts that Garcia "intentionally drove his vehicle into mine to cause damage and or injury to myself to prevent his detention," the United States does not introduce persuasive evidence suggesting that Garcia intended to injure Placencio; it is more likely that Garcia crashes his car into Placencio's to disable the police vehicle and escape detention rather than to injure Placencio. Arrest Warrant #1 at 8. Cf. State v. Lett, No. A-1-CA-38879, 2023 WL 2535893, at *4 (N.M. Ct. App. March 16, 2023), cert. denied, 2023-NMCERT-006, ¶ 17, 547 P.3d 81 (concluding that there is sufficient evidence that a defendant intends to injure a police officer when the defendant "became very angry" at the officer and "said, 'That's it, motherfucker,' just before" tackling the officer). Thus, the United States does not show, by a preponderance of the evidence, that Garcia intends to injure Placencio when he crashes into the police vehicle.

Regarding the second missing essential element, Placencio does not assert that he suffers any pain, or loss or impairment of any bodily functions when Garcia crashes into his police vehicle. See Arrest Warrant #1 at 8. Placencio shifting in his seat is not a "painful temporary disfigurement or temporary loss or impairment of the functions of any member or organ of the body." N.M.S.A. § 30-22-25(B). Thus, the United States does not show, by a preponderance of the evidence, that Garcia causes a significant enough injury to satisfy the other N.M.S.A. § 30-22-25(B) essential element. With two missing essential elements, the United States does not carry its burden to prove, by a preponderance of the evidence, that Garcia commits aggravated battery upon a peace officer without great bodily harm.

As to the second felony -- receiving or transferring a stolen vehicle -- the United States is also missing an essential element: that Garcia knew or had reason to know that the gray car has been stolen. See N.M.S.A. § 30-16D-4 (providing that "possession [of] any vehicle that the person knows or has reason to believe has been stolen or unlawfully taken" is a fourth-degree felony); N.M.R.A. UJI 14-1652 (listing § 30-16D-4's essential elements, including that the defendant

"knew or had reason to know that this vehicle had been stolen or unlawfully taken"); State v. Bernard, 2015-NMCA-089, ¶ 4, 355 P.3d 831, 834 (affirming N.M.S.A. § 30-16D-4's jury instructions that "specified that the State must prove beyond a reasonable doubt that Defendant had possession of each stolen vehicle and 'knew or had reason to know that [the] vehicle[s] had been stolen or unlawfully taken[.]'")(quoting N.M.R.A. UJI 14-1652)(brackets in State v. Bernard, but not in N.M.R.A. UJI 14-1652).  Although the United States proves that the gray car is stolen, see Arrest Warrant #1 at 8 (noting that APD reports the vehicle as stolen on December 19, 2023), the United States does not introduce evidence showing that Garcia knows, when he is driving the gray car, that it is stolen.  Thus, without an essential element, the United States does not carry its burden to prove that Garcia violates N.M.S.A. § 30-16D-4.  In sum, although the United States does not prove that Garcia commits aggravated battery upon a police officer, or receiving or transferring a stolen vehicle, the United States proves that Garcia commits one felony on December 28, 2023: possession of a firearm by a felon.

III.    **THE UNITED STATES PROVES -- BY A PREPONDERANCE OF THE EVIDENCE -- THAT GARCIA COMMITS ONE FELONY ON DECEMBER 29, 2023.**

    The United States proves -- by a preponderance of the evidence -- that Garcia commits one felony on December 29, 2023: escape from custody of a peace officer.  The Court makes findings of fact regarding the December 29, 2023, incident.  See supra, at 11-12 & nn.7-8.  While under lawful arrest,[16] Garcia breaks free of his flex cuffs and runs away from Salazar for approximately three blocks.  See supra, 11-12 & nn.7-8.  Breaking out of handcuffs, while under lawful arrest, and running away from a police officer for several blocks constitutes escape from custody of a

---

[16]Garcia does not allege that his arrest is unlawful.  See Objections at 1-4.  The Court concludes separately, however, that his arrest is lawful, because the officers arrest Garcia pursuant to an arrest warrant.  See supra, at 8; N.M.R.A. UJI 14-2223 (allowing a jury to find that an arrest is lawful if it is made "under authority of a warrant").

peace officer, which is a fourth-degree felony.  See N.M.S.A. § 30-22-10 ("Escape from custody

of a peace officer consists of any person who shall have been placed under lawful arrest for the

commission or alleged commission of any felony, unlawfully escaping or attempting to escape

from the custody or control of any peace officer."); N.M.R.A. UJI 14-2223 (listing N.M.S.A. § 30-

22-10 essential elements).

Garcia argues that, because he is apprehended shortly after running away, he commits only

an attempted escape, which, according to Garcia, is only a misdemeanor, because attempting a

fourth-degree felony is only a misdemeanor.  See Objections at 3.  The Court disagrees with Garcia

for two reasons.  First, Garcia escapes successfully, because he breaks free of his handcuffs and

runs free in downtown Albuquerque for several blocks.  See State v. Herrera, No. A-1-CA-37172,

2020 WL 5629801, at *6 (N.M. Ct. App. September 15, 2020)(concluding that a defendant escapes

from a peace officer, where the defendant in the backseat of a police vehicle slips out of her

handcuffs, tries to climb out of the window, and attacks the arresting officer, who restrains her

before she can get out of the vehicle).  Second, even if Garcia only attempts to escape, attempted

escapes are fourth-degree felonies under N.M.S.A. § 30-22-10's plain text.  See N.M.S.A. § 30-

22-10 (providing that anyone who, while under lawful arrest, "attempt[s] to escape from the

custody or control of any peace officer" commits a fourth-degree felony); N.M.R.A. UJI 14-2223

(providing that a defendant who "attempted to escape" is guilty of escape from custody of a peace

officer).  Thus, the United States proves -- by a preponderance of the evidence -- that Garcia

commits one felony on December 29, 2023: escape from custody of a peace officer.  In sum, the

Court overrules Garcia's objections and will not apply Garcia's requested § 2P1.1(b)(3) 4-level

reduction, because the United States shows -- by a preponderance of the evidence -- that Garcia

commits five felonies after escaping from the Diersen Center.

**IT IS ORDERED** that: (i) Defendant's Objections to Presentence Report, filed August 6, 2024 (Doc. 30), are overruled; (ii) the Court will not apply a 4-level reduction, pursuant to U.S.S.G. § 2P1.1(b)(3); (iii) the applicable offense level is 11; (iv) the applicable criminal history category is VI; (v) and the Guidelines imprisonment range is 27 to 33 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Ryan Ellison
  United States Attorney
Rumaldo R. Armijo
Sarah Jane Mease
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Devon Fooks
  Assistant Federal Public Defender
Office of the Federal Public Defender
Albuquerque, New Mexico

     *Attorneys for the Defendant*